UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
RICHARD STEWART,

               Plaintiff,

    -against-


CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

               Defendant.
-----------------------------------------------------------X
FEUERSTEIN, District Judge:

**FILED**
**CLERK**

2/23/2015 1:34 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**OPINION AND ORDER**
**12-CV-5695 (SJF)**

      Plaintiff seeks review of the unfavorable Notice of Decision ("Decision") of the

Commissioner of Social Security ("Commissioner") denying his request for social security

disability benefits.  The Commissioner and plaintiff have filed cross-motions for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the following reasons, the

Commissioner's motion is **DENIED** and plaintiff's motion is **GRANTED** in part and this case is

remanded for further findings consistent with this Opinion.

I.      **Background**

A.     **Testimonial and Other Evidence**

      Plaintiff was born in December 1958 and was fifty (50) on his alleged disability onset

date and fifty-two (52) as of the date of the Administrative Law Judge's ("ALJ") decision

denying benefits.  Tr. 102, 225.[1]  Plaintiff has a high school education.  Tr. 234, 524.  From 1987

to 2009, plaintiff was employed as a fire fighter for the New York City Fire Department

("FDNY").  Tr. 230, 247-49, 275.  Plaintiff fell and injured his neck at work on April 16, 2008

and was placed on desk duty answering telephone calls, which he allegedly became unable to

---

[1]  "Tr." refers to the transcript from the administrative record in this matter.

perform as of January 16, 2009. Tr. 229, 525-28, 537. On January 29, 2009, plaintiff was declared disabled and granted "accident disability retirement" by the FDNY based upon his neck injury. Tr. 220-22.

Plaintiff alleges that since his cervical injury, he has experienced a constant stabbing pain in his neck, back and right shoulder and arm along with tingling in his fingers. Tr. 244. He also alleges that his left bicep is easily fatigued and that he experiences weakness in both arms. Tr. 244, 260. As a result of the injury, plaintiff claims he has problems sleeping, awakens during the night due to pain, and is unable to lift heavy objects, look upwards, exercise, perform chores around the house or do yard work. Tr. 237, 239-41. He also alleges that bending over or lifting his arms above his head is painful. Tr. 237. Plaintiff is able to bathe, dress, take care of his personal needs, prepare simple meals with his wife's assistance, drive short distances and go outside by himself approximately three (3) times per week. Tr. 238-39. At his February 28, 2011 hearing before the ALJ, plaintiff testified that he takes Oxycodone twice a day for pain and reported that it helps "somewhat." Tr. 534. Plaintiff evaluated his pain at a six (6), or an eight (8) without medication, on a scale of ten (10). *Id.*

Plaintiff can walk for fifteen (15) minutes (Tr. 242), sit for approximately an hour and stand for an hour. Tr. 531-532. Plaintiff's pain makes it difficult for him to concentrate and affects his memory, but he can follow instructions. Tr. 242-43. Plaintiff socializes by telephone five (5) time per week for short periods and enjoys conventional relationships with family, friends, neighbors and others. Tr. 241.

## B.    Medical Evidence

According to plaintiff's FDNY medical records dated August 1, 2007 through February

15, 2009, plaintiff was treated for cervical and right arm pain with medications such as

Oxycodone, Vicodin and Motrin and had three (3) relatively unsuccessful cervical epidural

injections. Tr. 346-66. On May 31, 2008, however, plaintiff stated that the injection helped his

condition (Tr. 358) and on August 23, 2008, that the radiculopathy and neuropathy had improved

with physical therapy and pain management (Tr. 353).

On April 20, 2008, magnetic resonance imaging ("MRI") of plaintiff's cervical spine

showed: (1) a lateral herniated disc at C5-C6 on the right side involving the right neural foramen;

(2) a small focal central herniated disc at C4-C5; (3) a bulging disc at C6-C7; (4) degenerative

disc disease from C2 to T1: and (5) straightening of the normal cervical lordotic curve. Tr. 301.

Treatment notes, dated May 20, 2008 through September 17, 2009, by Noah Finkel,

M.D., one of plaintiff's treating doctors, show that plaintiff was treated for cervical pain. Tr.

379-91. On May 20, 2008, plaintiff told Dr. Finkel that on April 16, 2008, he had fallen on the

job when he slipped on oil while lifting his fireman's mask. Tr. 389. Upon physical

examination, Dr. Finkel noted decreased: (1) neck extension; (2) range of motion of the cervical

spine, especially with right lateral rotation; and (3) range of motion of right and left lateral

bending– the left side was stiffer than the right. *Id.* Plaintiff demonstrated fairly good forward

flexion, although he did complain of pain. *Id.* Plaintiff demonstrated 5/5 motor power in his bi-

lateral upper extremities, except for right grip strength which was approximately 4+/5. *Id.*

Plaintiff complained of tingling to light touch on the dorsolateral aspect of the forearm, thumb,

index and volar aspect of the index finger. *Id.* There was a 2+ deep tendon reflex present at the

left triceps, bilateral biceps and bilateral brachioradialis tendons. *Id.* Dr. Finkel was unable to

elicit deep tendon reflex at the right triceps tendon and noted a 2+ radial pulse bilaterally and a

negative Hoffman sign. *Id.* Plaintiff demonstrated significant tightness with palpitation of the cervical spine musculature and the trapezius muscles bilaterally, more so on the left than the right, and there was no specific tenderness with palpitation over the cervical spine itself. *Id.* Dr. Finkel prescribed Oxycodone and started plaintiff on a Decadron taper. *Id.*

On June 18, 2008, following one (1) epidural steroid injection, plaintiff reported that his neck pain significantly decreased and that pain and tightness in the triceps area had diminished. Tr. 390. Tingling in plaintiff's right hand remained unchanged and he reported episodes of lightheadedness when his neck was in certain positions. *Id.* Upon examination, plaintiff had improved mobility in his cervical spine; 5/5 grip strength; and 5/5 motor power overall in his bilateral upper extremities. *Id.* Plaintiff continued to experience decreased sensation to light touch in his right hand. *Id.*

On July 16, 2008, plaintiff reported that although he experienced no improvement after his second epidural steroid injection, his condition improved with his third injection. Tr. 388. The treatment notes indicate that plaintiff's bouts of lightheadedness had decreased and that the loss of sensation in his right hand had become more intermittent, but he continued to experience significant neck pain. *Id.* Upon examination, plaintiff appeared more comfortable, with better mobility, including a 5/5 motor power in bilateral upper extremities and a slight decreased sensation to light touch globally in his right hand. *Id.*

On August 20, 2008, plaintiff continued to complain of tingling in his fingers, pain in his neck and upper back region and increased weakness in his right upper extremity. Tr. 386. Plaintiff reported that although the epidural steroid injections were initially helpful, the relief did not last. *Id.* Upon examination, plaintiff had significant atrophy of the triceps muscle, weakness

with right elbow extension and, on the left, wrist and thumb extension weakness. *Id.* Otherwise, plaintiff had good strength in his bilateral upper extremities. *Id.* Dr. Finkel noted that plaintiff needed to work on strengthening his weak muscles and advised plaintiff to stop smoking before considering surgical intervention on his spine. *Id.*

On September 23, 2008, plaintiff continued to complain of weakness in his left upper extremity and his condition remained relatively the same despite some progress with the steroid injections. Tr. 384. Upon examination, plaintiff demonstrated improved mobility in the spine but continued to have weakness in the right triceps muscle. *Id.*

In October 2008, Paul Kuflik, M.D., of the Spine Institute of New York, examined plaintiff. Tr. 419. His report indicated that plaintiff had had a herniated disc at C5-6 on the right for six (6) months and that he had been treated with epidural steroid injections, physical therapy and pain management, but that his symptoms persisted. *Id.* Upon examination, plaintiff had restricted motion of his cervical spine and an absent brachioradialis reflex on the right. *Id.* Dr. Kuflik determined that plaintiff's condition would not improve without surgery and noted that surgical intervention "is a quality of life" decision and plaintiff "certainly could accept to live with this if his symptoms are not all that bad," however, with or without surgery, plaintiff would not be able to return to work as a firefighter. *Id.*

Also in October 2008, Dr. K. J. Kelly, Chief Medical Officer for the FDNY Bureau of Health Services, advised the Fire Commissioner that upon examination and review of Dr. Kuflik's report and other medical evidence, the medical committee deemed plaintiff permanently unfit for firefighting duties. Tr. 447. The examination conducted by the board stated the following: (1) plaintiff is a well-developed 49 year-old man who appears in no acute distress who

was able to walk into the examination room and sits and stands without difficultly; (2) examination of his cervical spine demonstrated normal alignment; (3) plaintiff was able to move his neck in a functional range of motion but has certain degrees of pain when he extends his neck or laterally rotates to the right side; (4) neurological function of upper extremities demonstrates no loss of strength to the biceps, triceps, grip strength, wrist extensors or flexors; (5) normal sensation to light touch in the upper extremities; plaintiff reports some tingling in the fingertips of his right hand; (6) a negative Hoffman test, with no pathology reflexes noted and intact grip strength; and (7) no upper motorneuron signs and no hyperreflexia.  Tr. 446.  The board's diagnosis was cervical radiculopathy without neurological deficit at the C5-6 level due to a peripheral hernia disc at the C5-6 level.  Tr. 447.

In November 2008, plaintiff saw Dr. Finkel and complained of significant pain in his right upper extremity, despite performing strength building exercises.  Tr. 383.  Upon examination, plaintiff continued to experience weakness of the biceps, triceps and deltoid muscles with resistive range of motion and parathesias to light touch globally in the right hand. *Id*.  He otherwise displayed good strength against resistance and Dr. Finkel noted that he remained symptomatic from cervical radiculopathy and prescribed Oxycodone.  *Id.*

On December 15, 2008, plaintiff saw Daniel Feuer, M.D., for a neurological evaluation. Tr. 448.  Upon examination, plaintiff's cervical spine was found to be nontender with no spasm. Cervical spine flexion, extension, right and left lateral flexion and left and right lateral rotation were all within normal range.  Tr. 449.  Deep tendon reflexes were active and symmetric in all groups except for the right triceps reflex, which was absent.  *Id.*  Mild weakness (5-/5) was present at the right triceps and brachioradials muscles; otherwise plaintiff demonstrated full

power in the upper and lower extremity muscle groups.  *Id.*  Plaintiff was remarkable for

hyperthesia to pin and light touch sensation in a right C6-7 distribution and his gait was normal.

*Id.*  An EMG of plaintiff's upper extremities demonstrated evidence of a right C6 greater than

C7 radiculopathy with subacute and chronic features.  Tr. 451.  Dr. Feuer diagnosed right C6-C7

radiculopathy and found that plaintiff demonstrated a permanent partial neurological disability

which precluded him from engaging in active employment as a firefighter.  Tr. 450.

Plaintiff had physical therapy approximately two (2) times per week from January 6, 2009

through March 19, 2009, which consisted of massage and lifting weights.  Tr. 367-78.  He

described the weightlifting exercises as repetitively raising metal plates weighing approximately

ten (10) pounds each on a pulley-type machine on which he performed twenty-four (24)

repetitions twice per week.[2]  Tr. 529-30.

On January 9, 2009, plaintiff reported to Dr. Finkel that his condition was unchanged

since his last appointment, that he attended physical therapy and took one (1) or two (2)

painkillers every other day.  Tr. 385.  Upon examination, plaintiff continued to experience pain

with cervical spine range of motion and remained weak upon resistive range of motion of the

right arm.  *Id.*  Plaintiff's sensation remained intact and for the first time, Dr. Finkel noted an

involuntary tremor in both of plaintiff's hands.  *Id.*  Plaintiff remained symptomatic with cervical

radiculopathy and his Oxycodone prescription was refilled.  *Id.*

A February 15, 2009 examination report by David Prezant, M.D., noted that plaintiff's

neck pain and the tingling in his right arm and hand continued.  Tr. 347.  The report also noted

---

[2]  Plaintiff's attorney later clarified that the metal plates were seven (7) pounds each, but because they are on a pulley system, the weight actually being lifted or pushed was less than the weight of the plates.

that movement caused pain, but plaintiff's motion and strength were intact and there was no abnormal neurological condition.  *Id.*

On March 12, 2009, plaintiff reported to Dr. Finkel that his condition was unimproved, he was out of work on disability and had opted not to undergo any surgical procedures, but was in the process of quitting smoking.  Tr. 382.  Upon physical examination, plaintiff appeared uncomfortable while seated on the exam table and was unable to stay in one (1) position for any length of time.  *Id.*  Plaintiff remained weak with resistive right upper extremity range of motion; however, in terms of strength, he showed some improvement.  Dr. Finkel concluded that plaintiff remained symptomatic from cervical radiculopathy and refilled plaintiff's Oxycodone prescription.  *Id.*

On March 30, 2009, plaintiff saw Dr. Finkel and complained of neck pain occasionally radiating down the right base of the neck and into his right arm.  Tr. 381.  Upon examination, plaintiff showed some limitation of range of motion and some tenderness at the base of the neck, however, it was difficult to elicit a radicular pain.  *Id.*  Neurologically, plaintiff appeared intact. *Id.*  The report also noted that plaintiff had been retired from the FDNY and he and Dr. Finkel discussed postural modifications and the need to avoid abusive activities and positions.  *Id.*

On April 30, 2009, plaintiff was evaluated by Aric Hausknecht, M.D., a pain management specialist who evaluated plaintiff's neurological and functional systems.  Tr. 413-17.  Upon neurological examination, Dr. Hausknecht noted that plaintiff's mental status was within normal limits as were his cranial nerves.  Tr. 415.  As to plaintiff's motor system, the doctor noted 5- weakness of the right shoulder abductor; 4- weakness of the right triceps; 5- weakness of the intrinsic muscles of the right hand; and atrophy with decreased muscle tone in the right upper-

arm.  *Id.*  The remainder of plaintiff's motor strength was intact in the upper and lower extremities and was graded 5/5 in all myotomal groups tested; volume was within normal limits.  *Id.*  The examination revealed no palpable spasticity, dysmetria or tremors and plaintiff demonstrated reduced deep tendon reflexes in the upper and lower extremities.  *Id.*  Plaintiff showed hypoesthesia (a reduced sense of touch or sensation) to light touch in the right C5-6-7 distribution, but the remainder of pain, temperature, vibration and light touch perception were within the normal limits in the trunk and extremities.  *Id.*  Plaintiff demonstrated cervical and lumbosacral paravertebral tenderness and associated muscular spasms and no discrete points on deep muscle palpitation.  Tr. 416.  Spurling maneuver is positive on the right and seated straight leg raise testing was positive on the left at 65 degrees.  *Id.*  Plaintiff had reduced range of motion on the right in the cervical spine, and on flexion and extension in the lumbar spine.  *Id.*

Plaintiff's functional examination revealed an antalgic gait and disc herniations at C4-5, C5-6 and C6-7 with associated spondylitic changes and some deformity of the spinal cord at level C4-5.  Tr. 416.  An NCV/EMG study performed December 16, 2008 showed right C5-6 radiculopathy.  *Id.*  Dr. Hausknecht's examination found cervical derangement with C4-5 through C6-7 herniations with associated right C6-7 radiculopathy and lumbrosacral derangement.  *Id.*

Dr. Hausknecht instructed plaintiff on stretching and strengthening exercises for his neck and back, recommended that plaintiff take his medications as prescribed and dispensed a sample of Amrix.  Tr. 417.  Further tests were recommended and plaintiff was advised to reconsider his position on surgery based upon the likelihood that his condition would continue to deteriorate.  *Id.*  The report also stated that plaintiff's April 16, 2008 work related injury was a substantial cause of his condition, that he had a poor prognosis and was totally disabled from all

forms of gainful employment.  *Id.*

An April 30, 2009 nerve conduction study showed "evidence of right C6/C7 radiculopathy."  Tr. 302.  On that same day, a Somatosensory Evoked Potential of the Median Nerve report showed an abnormal median nerve study and poor N13 evoked potentials suggestive of cervical myelopathy.  Tr. 310.

A May 19, 2009 cervical MRI showed disc herniations at C3/4, C4/5, C5/6 and C6/7 with right and left peripheral disc bulges at T1/2 through T3/4.  Tr. 429-30.

A May 26, 2009 MRI scan of the lumbar spine showed: (1) disc hydration loss, Schmorl's irregularities and anterior disc extension, and spurring at T11/12 through L/5-S/1; (2) posterior disc bulge impressing the ventral cord at T11/12; (3) posterior disc bulges and osseous ridging at T12/L1 through L3/4; (4) facet hypertrophic changes at L2/3 and L3/4; (5) central canal stenosis at L2/3; (6) diminished L4/5 disc space height with grade I retrolisthesis, posterior disc herniation and osseous ridging, with impingement on the exiting left L4 root; (7) diminished L5/S1 disc space height with grade I anterolisthesis, facet hypertrophic change, posterior disc herniation and narrowing of the left greater then [sic] right foramina; and (8) impingment on the exiting left L5 root.  Tr. 427.

On June 22, 2009, plaintiff saw Dr. Finkel who noted that the MRIs of plaintiff's cervical and lumbar spine revealed intervertebral disc disorder and spondylosis, with the cervical spine showing greater involvement.  Tr. 380.  The report also noted that plaintiff continued to have problems related to pain in his cervical spine and numbness in his upper right extremity.  *Id.* Plaintiff's condition was basically unchanged and he was given a prescription for Oxycodone. *Id.*

On September 17, 2009, plaintiff saw Dr. Finkel, who noted that plaintiff's status was basically unchanged except that plaintiff's neck pain now radiated into his left upper extremity and he had weakness in both arms. Tr. 379. Upon examination, plaintiff had stiffness and discomfort with testing his cervical spine's range of motion and, with resistive testing, his right triceps muscle was weak, although he had good strength in his left upper extremity. *Id.* Plaintiff had not refilled his June 2009 Oxycodone prescription and was given a new prescription. *Id.*

Plaintiff was referred by the Division of Disability Determination for an orthopedic examination, which was performed by Erlinda Austria, M.D. on March 1, 2010. Tr. 395. Plaintiff advised Dr. Austria that he continued to experience constant pain to his neck and lower back, weakness in both upper arms and numbness and tingling in his right hand. *Id.* He reported his pain level on a good day as seven (7) to eight (8) out of ten (10). *Id.* Plaintiff reported that he could zip a zipper, button a shirt, lift a half-gallon of milk (approximately five (5) pounds) and carry it for less than a minute. *Id.* Plaintiff can sit and stand for five (5) minutes; walk for thirty (30) minutes before needing to change positions, move or rest; and can climb one (1) step at a time. *Id.* Plaintiff cannot open a jar with his right hand. *Id.* Plaintiff's wife does most of the cooking, cleaning, laundry and shopping, although plaintiff can shower and dress himself, albeit with pain. Tr. 396. The report states that plaintiff was not in acute distress, his gait was normal, he could walk on his heels and toes with some difficulty, and was able to squat halfway. *Id.* Plaintiff used no assistive devices and could rise from a chair and ambulate on and off of the examination table without difficulty; he did not require assistance to change out of or in to his clothes. *Id.* Plaintiff's hand and finger dexterity were intact and his bilateral grip strength was 5/5. *Id.*

Examination of plaintiff's cervical spine revealed flexion to thirty-five (35) degrees, extension to ten (10) degrees, rotation to forty-five (45) degrees on the right and sixty (60) degrees on the left, with no cervical or paracervical pain or spasm. *Id.*

Examination of the upper extremities showed forward elevation of the shoulders 130 degrees, abduction to 130 degrees, adduction to 30 degrees, interior rotation to 30 degrees and exterior rotation to 60 degrees, all bilaterally. Tr. 397. Plaintiff had full bi-lateral range of motion of the elbows, forearms, wrists and fingers. *Id.* He had no joint inflammation, effusion or instability. *Id.* Plaintiff's strength in his proximal and distal muscles was 5/5, with no muscle atrophy or sensory abnormality and his reflexes were physiologic and equal. *Id.*

Examination of the thoracic and lumbar spines showed flexion and extension to 90 degrees, lateral flexion 20 degrees and lateral rotation 20 degrees, both bilaterally. *Id.* There was no spinal, paraspinal, S1 joint or sciatic notch tenderness and no spasms, scoliosis or kyphosis. *Id.* Plaintiff's seated leg raise was 70 degrees bilaterally in the supine position and 90 degrees bilaterally in the sitting position. *Id.*

Examination of the lower extremities revealed hip flexion/extension to 80 degrees bilaterally; interior rotation to 30 degrees bilaterally; and exterior rotation to 40 degrees bilaterally. *Id.* Plaintiff had full bilateral backward extension, abduction and adduction; knee flexion and extension was 120 degrees bilaterally; and full range of motion of the ankles. *Id.*

Dr. Austria stated that in her opinion, plaintiff had mild to moderate restriction with limited range of motion in activities involving the head and neck, particularly on the right side. Plaintiff also showed mild restriction and limited range of motion for activities involving the upper right extremity and no restriction to the rest of the upper extremities, including fine motor

movement.  *Id.*  Plaintiff demonstrated minimal restriction to squatting, bending, prolonged sitting, standing and walking.  Tr. 398.

By letter dated January 13, 2011, Dr. Finkel wrote to plaintiff's attorney and indicated that he last treated plaintiff on November 15, 2010 and that plaintiff remained disabled from performing his duties as a firefighter.  Tr. 442-44.  The letter also noted that surgery had been recommended to treat cervical radiculopathy and that plaintiff continued with therapy and medication.  Tr. 443.

A January 18, 2011 Functional Assessment form completed by Francis J. Lanzone, M.D., indicated that plaintiff could, in the course of an eight (8) hour workday: (1) stand or walk for less than two (2) hours; (2) sit for less than six (6) hours; (3) lift and/or carry less than five (5) pounds for two-thirds of a workday; and (4) lift and/or carry less than three (3) pounds for two-thirds of a workday.  *Id.*  The form also indicated that the following limitations would interfere with plaintiff's ability to work an eight (8) hour shift in a five (5) day work week: (1) needs bed rest and frequent breaks during the work day; (2) suffers with pain; (3) requires medications that interfere with his ability to function and concentrate in the work setting; and (4) requires an average two (2) or more sick days off each month.  Tr. 412.  Dr. Lanzone reported these limitations in a January 19, 2011 letter to plaintiff's attorney and advised that plaintiff had reached maximum medical improvement and was totally permanently disabled.  Tr. 440-41.

At a hearing held on February 28, 2011, John Axline, M.D., the medical expert, testified that inconsistencies in the straight leg raising part of the examination indicated "symptom exaggeration" or "malingering."  Tr. 473.  Dr. Axline also testified that plaintiff's medical problems did not render plaintiff disabled pursuant to any section of 20 C.F.R. Part 404, subpart

P, Appendix 1, the listings. Tr. 484-85. According to Dr. Axline's assessment, although plaintiff had some limitations to the upper right extremity, his condition did not meet a listing. Tr. 485. Thus, Dr. Axline found that it would be appropriate for plaintiff to limit frequent lifting to ten (10) pounds and occasional lifting to twenty (20) pounds. *Id.* Dr. Axline also found that plaintiff's ability to walk was not impaired. *Id.* On cross-examination by plaintiff's attorney, Dr. Axline testified that plaintiff's failure to refill his prescription for Oxycodone in 2009 "indicated that the pain might not be as severe" as plaintiff claimed. Tr. 509. Dr. Axline rejected plaintiff's doctors' weight restrictions as unrealistic in light of plaintiff's admission that he can lift ten (10) pounds, or a gallon of milk, in light of the fact that driving a car requires an individual to exert more strength than is required to lift (3) pounds. Tr. 513.

By Notice of Decision dated April 22, 2011, ALJ Zachary Weiss held that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act and his request for disability benefits was denied. By letter dated September 28, 2012, the Social Security's Office of Disability Adjudication and Review denied plaintiff's request for review and, consequently, the ALJ's Decision became final.

## II.    Discussion

## A.       Standard for Determining Disability

Pursuant to 42 U.S.C. § 423(d)(1)(A), the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. § 423(d)(2)(A).

**B.      Standard of Review**

Federal Rule of Civil Procedure ("FRCP") 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."  In deciding a motion brought pursuant to FRCP 12(c), the Court applies "the same standard as that applicable to a motion under rule 12(b)(6)."  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citing *Ad-Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987)).  Thus, a "party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law."  *Straw v. Apfel*, No. 98 Civ. 5089, 2001 WL 406184, at *2 (S.D.N.Y. Apr. 20, 2001).

When considering a motion to dismiss a complaint, or one for judgment on the pleadings, the court must assume as true all allegations contained in the complaint.  *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).  Furthermore, a court must construe the pleadings and any

reasonable inferences in the light most favorable to the non movant. *Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 54 (2d Cir. 1985). "In resolving motions made pursuant to [FRCP] 12(c), a court is generally limited to considering the factual allegations set forth in the pleadings" because the use of materials outside the scope of the pleadings converts the motion into one for summary judgment. *Abiona v. Thompson*, 237 F. Supp. 2d 258, 265 (E.D.N.Y. 2002). Where the parties refer to the administrative record, regulations and ALJ decisions, however, those materials are deemed incorporated into the pleadings and are properly considered by a court deciding a motion brought pursuant to FRCP 12(c). *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

In deciding a motion for judgment on the pleadings, the reviewing court "must first be satisfied that the 'claimant has had a 'full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.' " *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Echevarria v. Sec'y of Health & Human Serv.*, 685 F.2d 751, 755 (2d Cir. 1982)). "It is the Commissioner's affirmative responsibility to develop the record in such a way as to ensure a full and fair hearing." *Crespo v. Barnhart*, 293 F. Supp. 2d 321, 324 (S.D.N.Y. 2003). *See*, *e.g.*, *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

After the Court is satisfied that the record is fully developed, it "reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada*, 167 F.3d at 773. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (holding that applying substantive law to uphold a denial of benefits before ensuring that the ALJ applied the correct legal principles creates "an unacceptable risk that a claimant will be deprived of the right to have her disability determination made" pursuant to the proper legal standards).

"Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada*, 167 F.3d at 773. A decision denying benefits must be affirmed if it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Meney v. Astrue*, 793 F. Supp. 2d 621, 623 (2011) ("The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards."); *Stiggins v. Barnhart*, 277 F. Supp. 2d 239, 243 (W.D.N.Y. 2003). Thus, a court's "function is limited to assessing whether the Commissioner applied the proper legal standards in making his determination and whether that determination is supported by the substantial evidence on the record as a whole." *Cruz v. Barnhart,* 343 F. Supp. 2d 218, 221 (S.D.N.Y. 2004) (quoting *Stancel v. Apfel*, No. 99 Civ. 9339, 2000 WL 1839758, at *3 (S.D.N.Y Dec. 13, 2000)). "[I]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). *See Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (holding that a " 'court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review' ") (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

"Substantial evidence requires 'less than a preponderance, but more than a scintilla of evidence [and] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *T-Mobile Northeast LLC v. Town of Islip*, 893 F. Supp. 2d 338, 354 (E.D.N.Y. 2012) (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

"When there are gaps in the administrative record or the ALJ has applied an improper

legal standard," remand to the Secretary for further development of the evidence is required. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (citing cases).

## C.    Whether the ALJ Applied the Correct Legal Standards

### 1.    Legal Standards for Disability Evaluations

Social Security Administration regulations establish a five-step process that the Commissioner is required to follow in evaluating a claim for disability benefits. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); *Stiggins*, 277 F. Supp. 2d at 242; 20 C.F.R. § 404.1520. "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Draegert*, 311 F.3d at 472; *see* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In performing the disability evaluation, the ALJ must consider certain facts, including: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (citing cases). The analysis is sequential: if the claimant is found disabled or not disabled at a step, the Secretary makes its decision or determination and does not proceed to the next step. *Meney*, 793 F. Supp. 2d at 623; 20 C.F.R. § 404.1520(a)(4).

"The claimant bears the burden of proof as to the first four steps, while the Secretary bears the burden of proof as to the last step." *Murphy v. Sec'y of Health and Human Servs*., 872

F. Supp. 1153, 1157 (E.D.N.Y. 1994) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)).

### 2. ALJ Weiss's Decision

As to the first step of the sequential evaluation process, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 16, 2009, the alleged onset date. Tr. 12. As to the second step, the ALJ found that plaintiff's had one (1) severe impairment, i.e., discogenic disease of the spine. *Id.* At the third step, the ALJ determined that, based upon the medical expert's testimony, the plaintiff's impairment alone or in combination, satisfied the criteria of the listings of impairments, particularly the musculoskeletal disorders contained within section 1.00 *Id.* Prior to reaching step four (4), the ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b).[3] Tr. 13-17. At step four (4), the ALJ determined that plaintiff was unable to perform any past relevant work, but, at step five (5), found that based upon plaintiff's age, education, work experience and RFC, there were jobs, which exist in significant numbers in the national economy, that plaintiff could perform. Tr. 18. Accordingly, the ALJ noted that a finding of "not disabled" was directed by Medical -Vocational Rule 202.14 and that plaintiff had not been under a disability, as defined by the Social Security Act, from January 16, 2009 through

---

[3] Pursuant to 20 C.F.R. § 404.1567(b), light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

the date of decision.  *Id.*

Based upon the foregoing, the ALJ applied the relevant sequential analysis in determining plaintiff's claim for disability benefits.

**D.      Whether the ALJ's Decision is Supported by Substantial Evidence**

If a court determines that the ALJ applied the proper legal principles in evaluating a plaintiff's eligibility for Social Security disability benefits, the next inquiry is whether the decision is supported by substantial evidence.

**1.      Whether the ALJ Properly Evaluated the Medical Evidence Submitted by Drs. Hausknecht and Lanzone**

Plaintiff contends that the ALJ incorrectly evaluated the medical evidence submitted by plaintiff's treating physicians, Drs. Hausknecht and Lanzone.  Mem. in Opp. p. 12.  Upon consideration of the 20 C.F.R § 416.927 and SSR 96-2p factors for weighing medical opinions, the ALJ gave little weight to the two (2) doctors' opinions. Tr. 17.

Insofar as plaintiff argues that the ALJ improperly discounted Dr. Hausknecht's statement that plaintiff was "totally disabled from all forms of gainful employment," as conclusory and reserved for the Commissioner (*id.*), 20 C.F.R. § 404.1527(e)(2)(i) provides that although ALJs must consider findings of "medical specialists as opinion evidence," the "ultimate determination about whether [an individual] is disabled" belongs to the ALJ.  *See Pope v. Barnhart,* 57 F. App'x 897, 899 (2d Cir.2003) (holding that a treating physician's conclusion that a plaintiff is "completely disabled" may not be given controlling weight because this issue is reserved for the Commissioner).

Plaintiff also argues that Dr. Hausknecht was a "treating physician" and the ALJ incorrectly characterized the doctor/patient relationship in evaluating Dr. Hausknecht's medical opinion. Title 20 C.F.R. § 404.1502 defines a "treating source" as a claimants' "own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . medical treatment or evaluation and who has, or has had, an *ongoing treatment relationship with [the claimant]*." To establish an ongoing treatment relationship with an accepted medical source, the claimant must see, or have seen, "the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. § 404.1502.

In determining the weight to accord a treating source, 20 C.F.R. § 404.1527(c)(2) requires that the ALJ "give more weight to opinions from [a claimant's] treating sources," as "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." Where a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the ALJ] will give it controlling weight." *Id.* If the ALJ determines that the treating source's opinion is not due controlling weight, it must

apply the factors in subpart (c)(2)(i) and (c)(2)(ii)[4] and the factors in (c)(3) through (c)(6)[5] to determine the weight to give the treating source's opinion. 20 C.F.R. § 404.1527. Moreover, the ALJ shall "always give good reasons in [the] notice of determination or decision for the weight" given the treating source's opinion.

The record demonstrates that plaintiff first saw Dr. Hausknecht on April 30, 2009, for a second opinion, at which time the doctor prepared a comprehensive report addressed to Dr. Finkel and entitled "Initial Neurological Office Visit." Tr. 413-17. The ALJ determined that "little weight" was due Dr. Hausknech's opinion because he did not have an ongoing treatment relationship with plaintiff. Tr. 17. Following the unfavorable Decision, plaintiff requested review from the Social Security's Appeals Council ("Council"), arguing that the ALJ: (1) abused his discretion; (2) made errors of law by failing to give treating sources' opinions the proper weight; and (3) failed to support his findings and conclusions by substantial evidence. Tr. 24-25. With his request for review and for the first time, plaintiff submitted Dr. Hausknecht's neurology progress notes, dated July 20, 2009 through January 10, 2011, which concluded that plaintiff's prognosis was "guarded" or "poor." Tr. 455-62. Based upon Dr. Hausknecht's treatment notes, however, he falls within the definition for a treating source pursuant to 20 C.F.R. § 404.1502, *supra*.

---

[4] Subpart (c)(2)(i) requires the ALJ to consider the length of the treatment relationship and frequency of examination and (c)(2)(ii) requires the ALJ to consider the nature and extent of the treatment relationship.

[5] Under (c)(3)-(6), the ALJ must consider the degree to which the medical opinion is supported; how consistent the opinion is with the rest of the evidence; whether the opinion is from a specialist in the medical area at issue; and other factors which tend to support or contradict the opinion.

By Notice of Appeals Council Action ("Notice") dated September 28, 2012, the Council, upon consideration of the new evidence[6] and the contentions in plaintiff's brief, determined that the ALJ adequately considered and evaluated the evidence and, therefore, there was no basis to change the Decision. Tr. 1-2. Accordingly, the Decision became the final decision of the Commissioner of Social Security. Tr. 1.

"While evidence submitted to the Appeals Council becomes part of the administrative record, *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996), the Appeals Council, in reviewing a decision based on an application for benefits, will consider new evidence only if (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence." *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010) (citing 20 C.F.R. § 416.1470). " '[W]here newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion.' " *Judge v. Comm'r of Soc. Sec.*, No. 12 Civ. 482, 2013 WL 785522 , at *6 (N.D.N.Y. Feb. 1, 2013) (quoting *James v. Comm'r of Soc. Sec.*, No. 06 Civ. 6180, 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

Although the Council considered the new evidence submitted with the request for review, it did not explain why it declined to find that Dr. Hausknecht was a treating source under Social Security's definition (*see, supra,* 20 C.F.R. § 404.1502), or why the doctor's reports were

---

[6] Dr. Hausknecht's progress notes, dated July 20, 2009 through January 10, 2011, became part of the record on September 28, 2012 by Order of the Appeals Council. Tr. 5.

immaterial. Tr. 2. *See Judge*, 2013 WL 785522, at *6 ("The Appeals Council also should have explained what weight, if any, it was affording to the assessment and provided an explanation for its decision."). This was error in light of the ALJ's findings that Dr. Hausknecht (1) evaluated plaintiff a single time, and (2) did not have an ongoing relationship with plaintiff, which was part of his decision to accord Dr. Hausknecht's medical opinion "little weight." Tr. 16, 17. " 'Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.' " *Judge*, 2013 WL 785522, at *6 (quoting *Snell*, 177 F.3d at 134). Based upon the foregoing, this case is remanded for the ALJ to determine the proper weight to accord Dr. Hausknecht's medical opinion in his capacity as a treating source.

Plaintiff also claims that the ALJ did not accord the proper weight to Dr. Lanzone's findings. Mem. in Opp. p. 14. As discussed above, on January 18, 2011, Dr. Lanzone assessed plaintiff's ability to do sedentary work. Tr. 411. By letter dated January 19, 2011 and addressed to plaintiff's attorney, Dr. Lanzone advised that he first evaluated plaintiff on March 24, 2009 and, in the course of treatment, administered three (3) epidural injections followed by several orthopedic procedures. Tr. 440. The letter also stated that plaintiff was seen by Dr. Lanzone on a regular basis for observation and continued elevation. Tr. 441. Dr. Lanzone found that plaintiff was unable to work for gainful employment and repeated his findings with respect to plaintiff's ability to sit, stand, etcetera, in the course of a workday, as set forth above.

The ALJ found that Dr. Lanzone's "assessment of the claimant's ability to perform work-related activities lacks evidentiary support since he failed to submit any treatment records" and the assessment was "also inconsistent with other opinion evidence of record and is overly-restrictive in comparison." Tr. 17. Plaintiff argues that if the ALJ found that Dr. Lanzone's

-24-

conclusions were inconsistent with other opinions in the record, he had a duty to develop the record and state how he resolved the inconsistency.

Although an "ALJ has an independent duty to resolve ambiguities and inconsistencies . . . where the inconsistencies do not appear resolvable, the ALJ may decide based on the available evidence." *Pope,* 57 F. App'x at 899 (citing 20 C.F.R. § 404.1527(c)(3) & (4)). The ALJ determined that Dr. Lanzone's assessment of plaintiff's ability to perform work-related activities was inconsistent with other opinions in evidence and, *in comparison*, were overly restrictive. Tr. 17 (emphasis added). Thus, the inconsistencies appear to be irreconcilable differences of medical opinion that the ALJ was not required to resolve.

**2.    Whether the ALJ Erred by Relying on Non-Treating Sources**

Plaintiff also contends that rather than give the appropriate controlling weight to his treating physicians, the ALJ rejected their findings in favor of the consulting orthopedic examiner, who saw plaintiff one (1) time, and the medical expert, who never personally examined plaintiff. Mem. in Opp. pp. 15-16.

With respect to the orthopedic consultant Dr. Austria, the ALJ gave her opinion significant weight because it was well supported by the clinical and laboratory data of record and was not inconsistent with the other evidence. Tr. 17. The ALJ also found that Dr. Austria assessed limitations commensurate with the ability to perform light work activities and that her assessment was reasonably consistent with the conclusions of Drs. Finkel, Kuflik, Feuer and the FDNY physicians, who all found that claimant should not work as a firefighter. *Id.* As to Dr. Axline, the medical expert, the ALJ gave his opinion "the most significant weight," finding that

his opinion was well supported by specific references to medical evidence and was consistent with "the totality of the clinical findings." *Id.* The credibility of Dr. Axline's opinion was enhanced as he was "the only physician to review the entire medical record" as "an expert in the determination of disability based on Social Security standards." *Id.*

Despite the fact that Dr. Finkel was a treating source,[7] the ALJ only gave his opinion "some weight" to the extent it was supported by, and not inconsistent with, other record evidence. Tr. 17. Plaintiff argues that the ALJ did not weigh all of the 20 C.F.R. § 404.1527(c) factors, *supra*, in determining that Dr. Finkel's opinion was not due controlling weight and, therefore, his findings should be dismissed as an inaccurate application of the Treating Physicians's Rule.

With respect to Dr. Finkel, the ALJ considered the relevant treatment records, spanning May 2008 through September 2009, § 404.1527(c)(2)(i), as well as the nature and extent of the treatment relationship, *id.* at (c)(2)(ii), including the doctor's "repeated physical examinations" of plaintiff, which disclosed some restricted mobility in plaintiff's neck and decreased sensation over his right hand. Tr. 14. The ALJ found that plaintiff's "complaints of debilitating pain were not entirely consistent with the doctor's objective findings" and that Dr. Finkel's opinion "is significant for what he did not say; that is, he did not state that the claimant was disabled, only that he could not return to his past work" as a firefighter. Tr. 15. The ALJ found that Dr. Finkel's clinical findings reasonably supported the doctor's opinion, but did not "support a finding that the claimant is disabled for all work activities." *Id.*; § 404.1527(c)(3) and (6). Based

---

[7] As discussed above, Dr. Finkel treated plaintiff for his injury from May 2008 through September 2009.

upon the foregoing, the ALJ found that some of Dr. Finkel's opinions were supported by

objective medical evidence and were not inconsistent with other opinions, § 404.1527(c)(4), and,

thus, he applied the proper factors in explaining his decision to accord "some weight" to Dr.

Finkel's opinion. *See Moulding v. Astrue*, No. 08 Civ. 9824, 2009 WL 3241397, at *10

(S.D.N.Y. Oct. 8, 2009) ("Because the ALJ acted properly in giving those treating source

opinions only limited weight, they are not impervious to contradiction by the opinions of non-

treating sources, at least where the latter are more persuasive according to the factors set forth in

the regulations.").

###  3. Whether the ALJ Failed to Develop the Record

Plaintiff also argues that if the ALJ found that Dr. Lanzone did not provide adequate

evidence on the treatment relationship with plaintiff, he is required by law to contact the

physician. Mem. in Opp. p. 18.

The ALJ noted that by letter addressed to plaintiff's attorney, Dr. Lanzone advised that he

had seen plaintiff regularly since March 2009 and had reviewed plaintiff's cervical and lumbar

MRIs showing herniated and bulging discs. Dr. Lanzone did not, however, "describe what, if

any, clinical findings, he observed at the claimant's evaluations." Tr. 16. Instead, Dr. Lanzone

advised that plaintiff's condition remained the same and he was unable to work for gainful

employment as he could not stand for more than two (2) hours, sit more than six (6) hours or

carry anything more than several pounds during the course of an eight (8) hour day. Tr. 17. In

assigning "little weight" to Dr. Lanzone's opinion, the ALJ found that the doctor's assessment of

plaintiff's ability to perform work-related activities lacked evidentiary support since he failed to

submit any treatment records.

"Correct application of the sequential process requires a full and complete medical record." *Nozan v. Comm'r of Soc. Sec.*, No. 05 Civ. 1948, 2006 WL 2927170, at *4 (E.D.N.Y. Oct. 11, 2006) (citing 20 C.F.R. § 404.1593). "If the record is incomplete, the essentially non-adversarial nature of a benefits proceeding requires the ALJ to affirmatively develop the record." *Id.* Thus, pursuant to § 404.1593, the SSA must develop the plaintiff's "complete medical history" and make "every reasonable effort" to help a plaintiff acquire the necessary medical reports. "The duty to develop the record exists even where a claimant is represented by counsel." *Nozan*, 2006 WL 2927170, at *4 (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

"This affirmative duty is enhanced when the record sought is that of a treating physician." *Id.* at *4 (citing *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999) ("The ALJ's responsibility to assist a claimant in obtaining her medical records carries particular importance in light of the well-established treating physician rule, which requires an ALJ to grant special deference to the opinions of a claimant's treating physician.").

The ALJ erred by failing to contact Dr. Lanzone to obtain plaintiff's treatment records, particularly given that Dr. Lanzone falls within the definition of a treating source. Accordingly, on remand, plaintiff is directed to produce any pertinent treatment records from Dr. Lanzone and submit them for consideration by the ALJ.

### 4.    Whether the ALJ Erred in Assessing Plaintiff's Credibility

Last, plaintiff contends that the ALJ erred in his credibility assessment of plaintiff's statements. *Id.* He argues that the ALJ improperly substituted his own opinion in discrediting plaintiff's reports of extreme pain.

Social Security's regulations "require the Commissioner, in making disability determinations, to consider all of a claimant's symptoms, including subjective complaints of pain." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1529(a)). The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.' " *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce . . . symptoms, such as pain," the ALJ "must then evaluate the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf*, 724 F. Supp. 2d at 349-50 (citing § 404.1529(c)(2)-(3)). Thus, in evaluating a claimant's subjective complaints, the ALJ must consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, received for pain relief or other symptoms; (6) any measures the claimant uses to relieve pain or other symptoms; and (7) other

factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); *see Hilsdorf,* 724 F. Supp. 2d at 350.

" 'It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.' " *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1982)). An "ALJ's decision to discount a claimant's subjective complaints of pain" will be upheld only when that decision is "supported by substantial evidence." *Id.*

The ALJ found that "after careful consideration of the evidence . . . the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible." Tr. 13. Additionally, "[e]ven considering all factors that would ordinarily enhance the claimant's credibility, including a commendable work history in public service, the level of limitation alleged by the claimant is not reconcilable with the totality of the evidence." Tr. 13-14. The ALJ also considered laboratory studies[8] from 2008 and 2009 and found they disclosed positive findings that did not reasonably account for plaintiff's alleged symptomatology. Tr. 14. In addition, the ALJ took into account FDNY records documenting plaintiff's complaints of ongoing pain in his back and right arm and a February 2009 examination showing intact motion and strength in the upper extremities. *Id.* An examination ordered by the FDNY in October 2008 demonstrated to the ALJ that plaintiff was "not as limited as claimed" in

---

[8] The ALJ considered the finding from three (3) MRIs of plaintiff's cervical, thoracic and lumbar spines. Tr. 14.

light of the results showing that plaintiff: (1) did not appear to be in acute distress, (2) was able to sit and stand without difficulty, (3) moved his neck in a functional range of motion, although he reported pain in certain positions, (4) showed no loss of strength in the biceps, triceps, grip, wrist extensors or flexors and had intact grip strength, and (5) had normal sensation to light touch in the upper extremities. Tr. 15.

In reviewing Dr. Finkel's treatment notes from 2008 through 2009, the ALJ found that plaintiff's "subjective complaints of debilitating pain were not entirely consistent with the doctor's objective findings" given that plaintiff retained 5/5 grip strength and good motor power in his upper extremities bilaterally and Dr. Finkel's consistent observation that plaintiff remained "neurologically intact." Tr. 14-15. As to pain medication usage, plaintiff advised Dr. Finkel that he was taking two (2) to three (3) oxycodone tablets per day in June 2009, but had not refilled his pain medication as of September 2009. The ALJ was "unconvinced by the explanation[9] that the claimant offered at the hearing regarding his failure to refill his medications." Tr. 15.

The ALJ also found that plaintiff's "allegations of disabling limitations are . . . inconsistent with his physical therapy sessions," even accepting plaintiff's claim that he used a pulley system to lift seven (7), not ten (10), pound weights. The ALJ stated that the load was a "great deal to lift repetitively" and "quite inconsistent with the claimant's subjective pain reports and his claims of lifting restrictions." Tr. 16.

The ALJ also found inconsistencies between the results of Dr. Austria's consultive

---

[9] Plaintiff testified that he had elected to receive prescriptions from one (1) doctor rather than several doctors at once. Tr. 36. Thus, according to plaintiff's attorney, Dr. Hausknecht, instead of Dr. Finkel, began prescribing Oxycodone and Valium to plaintiff. Tr. 36-37.

orthopedic evaluation and plaintiff's disability assertions because plaintiff displayed a normal gait, walked on his heels and toes with difficulty, squatted halfway, retained intact dexterity in his hands and fingers and demonstrated full 5/5 grip strength. *Id.*

Despite these determinations, the ALJ's findings with respect to plaintiff's credibility do not adequately address the factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) and, accordingly, this case is remanded for the ALJ to consider these factors.

**III.    Conclusion**

As discussed above, the Court finds that the ALJ (1) did not have the opportunity to consider Dr. Hausknecht's treatment notes; (2) failed to develop the record with respect to Dr. Lanzone; and (3) failed to apply the 20 C.F.R. § 404.1529(c)(3) factors in considering plaintiff's subjective complaints of pain.  For these reasons, plaintiff motion is **GRANTED** in part and this case is remanded for further proceedings consistent with this Opinion.  The Commissioner's motion for judgment on the pleadings is **DENIED**.

Dated: February 23, 2015
      Central Islip, New York

                                          _____
                                          Sandra J. Feuerstein, U.S.D.J.